## THE TOWN OF NEW HARTFORD *vs.* THE TOWN OF CANAAN.

Hartford District, March T., 1886.   PARK, C. J., CARPENTER, PARDEE, LOOMIS and GRANGER, Js.

The statute (Gen. Statutes, p. 196, § 4,) provides that an "inhabitant" of any town in this state may gain a legal settlement in any other town by supporting himself and paying all assessed taxes for six years.   *L* was born in 1836 in Massachusetts, his father being an alien residing there. When he was five years old his father removed with his family to this state, residing in different towns, but acquiring no settlement in them, and finally settling in *N*, where he resided till after *L* became of age. After reaching his majority *L* resided more than six years in *N*, self-supporting and paying all assessed taxes.   Held—

1. That *L* acquired by birth citizenship in the United States.
2. That when he became of age he began to acquire a settlement by commorancy in *N*.
3. That in coming from another town in this state to *N* he came as an "inhabitant" of the former town, although not then of age, and having no legal settlement there.
4. That he became a settled inhabitant of *N* at the end of the six years.

[Argued March 3d—decided May 3d, 1886.]

ACTION to recover for supplies furnished to a pauper claimed to belong to the defendant town; brought to the Court of Common Pleas of Litchfield County, and tried to the court before *Bradstreet, J.*   Facts found and judgment rendered for the plaintiffs and appeal by the defendants. The case is fully stated in the opinion.

*L. B. Dean* and *W. B. Smith,* for the appellants.

*A. H. Fenn,* for the appellees.

PARDEE, J.   LaFayette Parrott was born in 1836 in Massachusetts, his father being an alien resident there. Some five years thereafter the father removed with his family, including LaFayette, into this state; residing first for about two years in Colebrook; then for about the same

length of time in Winchester; going thence to Norfolk, where he resided until 1868. In 1855 in Norfolk he was naturalized, La Fayette being then a minor. After attaining majority the latter resided more than six years in Norfolk, presumptively self-supporting and paying all assessed taxes. In 1879 he came to want in the town of New Hartford, but had not then acquired a settlement there under the pauper laws. The latter town expended money for his support, and, claiming that the town of Canaan is his place of settlement, brought this suit for re-payment.

In *Lynch* v. *Clarke*, 1 Sandford's Ch. R., 584, it is said as follows:—" Upon principle, therefore, I can entertain no doubt but that, by the law of the United States, every person born within the dominion and allegiance of the United States, whatever was the situation of his parents, is a natural born citizen. It is surprising that there has been no judicial decision upon this question. None was found by the counsel who argued this cause, and, so far as I have been able to ascertain, it never has been expressly decided in any of the courts of the respective states or of the United States. This circumstance itself, in regard to a point which must have occurred so often in the administration of justice, furnishes a strong inference that there has never been any doubt but that the common law rule was the law of the land. This inference is confirmed and the position made morally certain by such legislative, judicial and legal expositions as bear upon the question. Before referring to these I am bound to say that the general understanding of the legal profession, and the universal impression of the public mind, so far as I have had the opportunity of knowing it, is that birth in this country does of itself constitute citizenship. Thus, when at an election the inquiry is made whether a person offering to vote is a citizen or an alien, if he answers that he is a native of this country, it is received as conclusive that he is a citizen. No one inquires further. No one asks whether his parents were citizens or were foreigners. It is enough that he was born here, whatever was the status of his parents. I know that common

consent is sometimes only a common error, and that public opinion is not any authority on a point of law. But this is a question which is more important and more deeply felt in reference to political rights than to rights of property. The universality of the public sentiment in this instance is a part of the historical evidence of the state and progress of the law on the subject, indicates the strength and depth of the common law principle, and confirms the position that the adoption of the federal constitution wrought no change in that principle." In *McKay* v. *Campbell,* 2 Sawyer, 118, it is said:—" By the common law a child born within the allegiance of the United States is born a subject thereof, without reference to the political status or condition of its parents." In 2 Kent's Commentaries, (9th ed.,) 1, it is said that "natives are all persons born within the jurisdiction and allegiance of the United States." To the text is subjoined the following note:—" This is the rule of the common law, without any regard or reference to the political condition or allegiance of their parents, with the exception of the children of ambassadors, who are in theory born within the allegiance of the foreign power they represent. *Calvin's case,* 7 Coke, 1; *Lynch* v. *Clarke,* 1 Sandford's Ch. R., 584, 639. In this last case the doctrine relative to the distinction between aliens and citizens in the jurisprudence of the United States was extensively and learnedly discussed, and it was adjudged that the subject of alienage, under our national compact, was a national subject, and that the law on this subject which prevailed in all the United States became the common law of the United States when the union of the states was consummated; and the general rule above stated is, consequently, the governing principle or common law of the United States, and not of the individual states separately considered. The right of citizenship, as distinguished from alienage, is a national right, character, or condition, and does not pertain to the individual states separately considered. The question is of national and not individual sovereignty, and is governed by the principles of the common law, which pre-

vails in the United States, and became, under the constitution, to a limited extent, a system of national jurisprudence. It was accordingly held in that case that the complainant, who was born in New York of alien parents, during their temporary sojourn there, and returned while an infant, being the first year of her birth, with her parents to their native country, and always resided there afterwards, was a citizen of the United States by birth. This was the principle of the English common law in respect to all persons born within the king's allegiance, and was the law of the colonies, and became the law of each and all of the states when the Declaration of Independence was made, and continued so until the establishment of the constitution of the United States, when the whole exclusive jurisdiction of this subject of citizenship passed to the United States, and the same principle has there remained."

In Field's International Code, 132, it is said:—" A legitimate child, wherever born, is a member of the nation of which its father at the time of its birth was a member." Upon this Morse, in his work on Citizenship, p. 17, thus comments:—" This is the law in most European states; (Westlake, p. 16; Foelix, p. 54;) but not in England or in the United States. However in *Ludlam* v. *Ludlam*, 26 N. York Rep., 371, the court says:—' Citizenship of the father is that of the child so far as the laws of the country of the father are concerned.' And it has been held in the United States that the national character of the parent is of no importance, even in the case of a child born within the territory to a parent who has not been, and has not taken any steps towards becoming, naturalized here, and who removes the child while an infant. *Lynch* v. *Clarke*, 1 Sandford's Ch., 585. But this decision seems not to be entirely approved (*Munro* v. *Merchant*, 26 Barbour, 400,) and probably would at the most be considered as authority only in regard to the right of succession to real property within that state."

But in *Munro* v. *Merchant*, (supra,) the marginal note is as follows:—" A child born in this state of alien parents

during its mother's temporary sojourn here, is a native born citizen." And the court says:—" It is further contended on the part of the defendant, that the plaintiff himself is an alien. He was born in Ballston Spa, in this state, while his father was a resident of Canada, and returned to his father's domicile with his mother within a year after his birth. His mother was temporarily there without any actual change of residence, either on her part or that of his father. It is argued that, at common law, a natural born subject was one whose birth was within the allegiance of the king. The cases of children of ambassadors born abroad, and of children born in English seas, were considered exceptions. Chancellor KENT, in his Commentaries, defines a native born citizen to be a person born within, and an alien one born out of, the jurisdiction of the United States. 2 Kent's Com., 37–50. In *Lynch* v. *Clarke*, 1 Sandf., Ch. R., 583, the question was precisely as here, whether a child born in the city of New York of alien parents, during their temporary sojourn there, was a native born citizen or an alien; and the conclusion was that, being born within the dominion and allegiance of the United States, he was a native born citizen, whatever was the situation of the parents at the time of the birth. That case, if law, would seem to be decisive of the present question. But, admitting the plaintiff to be an alien, the cases already cited show that the term 'heirs or assigns,' in the ninth article of the treaty, is not to be confined to the immediate descendants, but is to be extended indefinitely till the title comes to a citizen." The court did not find it necessary to deny the doctrine of *Lynch* v. *Clarke*, but rested its decision upon other grounds.

In *Ludlam* v. *Ludlam* (supra), among other facts found is the following: R. L. Ludlam, the father of Maximo M. Ludlam, in 1822 voluntarily expatriated himself from the United States, where he was a natural born citizen, for the purpose of becoming a permanent resident of Lima, in Peru, South America, and of establishing his permanent domicile there, and a few months thereafter did become such permanent resident and establish his permanent domicile

there, and M. M. Ludlam was there born of a native of Chili. The court says:—"If we assume that the laws of Peru are similar to ours on the subject of citizenship, there is no doubt that Maximo Ludlam would be in that country regarded as a citizen of Peru. 1 Sandford's Ch., 583. This would involve him, according to the rules which I find established, in a double allegiance to this country and Peru; and it cannot be denied that inconveniences might result from such a condition. The case however is not new, and I am not aware that any practical inconvenience has ever resulted to persons occupying such positions; their immunity in this respect resulting mainly, it may be presumed, from the liberality of civilized governments towards persons thus situated. * * * Practically the person so situated secures all the rights of citizenship, or at least the right of inheritance, in two countries, and discharges the duties of allegiance in only one."

In Morse on Citizenship, p. 241, sec. 203, is the following citation from an opinion of the secretary of state to the president:—"The child born of alien parents in the United States is held to be a citizen thereof, and to be subject to duties with regard to this country which do not attach to the father. * * * Such children are born to a double character; the citizenship of the father is that of the child so far as the laws of the country of which the father is a citizen are concerned, and within the jurisdiction of that country; but the child, from the circumstances of its birth, may acquire rights and owe another fealty besides that which attaches to the father."

In Rawle's View of the Constitution of the United States, p. 86, it is said:—"Every person born within the United States, its territories or districts, whether the parents are citizens or aliens, is a natural born citizen within the sense of the constitution, and entitled to all the rights and privileges appertaining to that capacity."

Again, neither in *Ludlam* v. *Ludlam*, nor in *Munro* v. *Merchant*, (supra), did the court undertake to decide the political question as to the extent to which the United

Town of New Hartford *v.* Town of Canaan.

States would be compelled to go in defense of persons born here of aliens; in each case it was defining private pecuniary rights under state laws. Such is the nature of the question in the case at bar. Practically it is, under our statutes, from what town is LaFayette Parrott entitled to receive aid if in want?

Moreover, if, as is suggested, he was born to the advantages of a double allegiance, upon attaining his majority he exercised the right which was his of electing the government to which he would give allegiance, and that election related back to the time of birth. Upon these authorities LaFayette had by birth what his father did not then have, citizenship of the United States and of the state of Massachusetts. This privilege neither needed nor received any strengthening by reflection from the subsequent naturalization of his father; he held it to the fullest extent in his own, and that the highest right. In *Town of Bridgeport* v. *Town of Trumbull*, 37 Conn., 484, the court, speaking of a minor born in New York of aliens, brought by her parents into this state, and here residing during six years, said of her that she was not an inhabitant of this state within the meaning of a cited statute. The obvious meaning of the court is that she was not a settled inhabitant. When this case was previously before this court, (52 Conn., 158,) the finding was that he came directly from Massachusetts to Norfolk. The court said—" LaFayette was born in Massachusetts in June, 1836, and resided there with his father until 1847, when both removed to Norfolk in this state, where they resided until 1868. These facts we think make LaFayette a citizen of the United States and of the state of Massachusetts by birth. 2 Kent's Com., p. 1, note *a*. When he went to Norfolk he had the same right as any other inhabitant of another state. Under the decisions in *Town of Bridgeport* v. *Town of Trumbull*, 37 Conn., 484, and *Town of Morris* v. *Town of Plymouth*, 34 id., 270, this right was suspended while he was a member of his father's family during his minority. But the record shows that he became of age in June, 1857, and resided thereafter in Norfolk until 1868; but the

further facts that are essential to bring him under the pro-
visions referred to in the second class are not found;"—
meaning thereby that possibly upon another trial it might
be proven that, during his residence in Norfolk after attain-
ing majority, he became a settled inhabitant, either by ad-
mission or by the ownership of real estate as prescribed by
statute, in his capacity as a resident citizen coming from
Massachusetts directly to Norfolk.  But upon the new trial
the fact came into the case that he came from Massachusetts
as a citizen there and became a resident citizen or inhabi-
tant of this state, first in Colebrook, then in Winchester,
going thence to Norfolk.  Of course if the acquisition of a
settlement in Norfolk may be made to rest upon his residence
while a minor in Massachusetts, it may be made to rest upon
his residence while a minor in Connecticut.

In 1857 he attained majority in Norfolk and then and
there began and completed a longer period than six years,
self-supporting and tax-paying.  In determining the ques-
tion whether he thereby acquired a pauper settlement in
Norfolk, we are to ask from whence did he come to that
town?  He came from another town in this state.  Of course
during minority he was obliged to serve and obey his father,
and under pauper laws the residence of the father was im-
parted to him.  It is true he did not remove from one resi-
dence to another in the right and power of an adult to deter-
mine for himself where he would live, but because of the
power of the father to command him.  But the subjection
of the son to the father did not destroy, or even affect, the
citizenship of the former; all the privileges and all the
duties pertaining to that right were his; he might be called
from under the father's authority to serve and defend the
United States or the state of his residence.  And wherever
he resided, although there by the command of his father, he
was an "inhabitant" in the fullest sense and by all defini-
tions.  The statute does not require him to come into Nor-
folk an adult inhabitant; nor does it require that the six
years of self-supporting and tax-paying residence shall begin
simultaneously with his coming from another town.  And

although while a minor in his father's family he could not acquire a settled inhabitancy because, in the matter of receiving aid from the public, the father is the representative of and recipient for the minor, yet after he had attained majority and had subsequently completed six years of self-supporting and tax-paying residence, it was his right to take advantage of any fact as to his status at birth, and as to subsequent inhabitancy, in establishing his legal settlement in Norfolk. His minority is not a blank.

The cases of *Huntington* v. *Oxford*, 4 Day, 196, *Salisbury* v. *Fairfield*, 1 Root, 132, and *Sterling* v. *Plainfield*, 4 Conn., 115, decide nothing more than that a minor cannot gain a settlement for pauper purposes by commorancy; they do not decide that he may not be an *inhabitant*.

In *Scott* v. *Sanford*, 19 Howard, 422, it is said:—"Undoubtedly a person may be a citizen, that is, a member of the community who form the sovereignty, although he exercises no share of the political power, and is incapacitated from holding particular offices. Women and minors, who form a part of the political family, cannot vote; and when a property qualification is required to vote or hold a particular office, those who have not the necessary qualifications cannot vote or hold the office, yet they are citizens."

Therefore LaFayette Parrott, as an inhabitant of Winchester removing to Norfolk, became and continues to be a settled inhabitant of the last named town. This conclusion renders it unnecessary to discuss other questions presented.

There is error in the judgment of the court below.

In this opinion the other judges concurred.